**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 27 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**T. DEAN SWIHART**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**DAVID E. COREY**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF S.S. | ) ) ) | |
| D.S. | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A03-1112-JT-592 |
| DEPARMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Thomas P. Boyer, Judge
The Honorable Lori K. Morgan, Magistrate
Cause No. 02D08-1102-JT-30

**July 27, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

D.S. (Father) appeals the involuntary termination of his parental rights to his child, SS. Father presents the following restated issues for review:

1. Did the trial court fail to provide Father with adequate notice of the rescheduled termination hearing, thereby denying him due process of law?

2. Was the evidence sufficient to support the trial court's judgment?

3. Did the trial court commit reversible error in overruling Father's objections to certain testimonial evidence?

We affirm.

Father is the biological father of S.S., born in March 2010.[1] The facts most favorable to the trial court's judgment reveal that shortly after S.S.'s birth, the local Allen County office of the Indiana Department of Child Services (DCS) was notified that the child had been born testing positive for cocaine. During its assessment of the matter, DCS learned that Mother had also tested positive for cocaine and was involved in a violent relationship with her boyfriend, which resulted in the issuance of an order for protection prohibiting contact between them. In addition, Father admitted to DCS personnel that he had used cocaine in the past and that he had never paid any child support for S.S. As a result of its assessment, DCS took S.S. into emergency protective custody and filed a petition with the trial court alleging S.S. was a child in need of services (CHINS).

Following a hearing in July 2010, the trial court issued a dispositional order formally removing S.S. from Father's care and custody and directing him to participate in a variety of

---

[1] S.S.'s biological mother, A.H. (Mother), signed a consent for adoption pertaining to S.S. and does not participate in this appeal. In addition, S.S.'s step-sibling, who was also removed from the family home with S.S., is not Father's biological child and therefore is not a subject of this appeal. We therefore limit our

tasks and services designed to facilitate reunification. Among other things, Father was ordered to: (1) refrain from all criminal activity; (2) maintain clean, safe, and appropriate housing at all times; (3) obtain and maintain steady employment; (4) cooperate with all case workers and service providers by attending all case conferences, maintaining contact with case workers, and accepting all announced and unannounced home visits; (5) successfully complete and benefit from a drug and alcohol assessment, as well as a family functioning assessment, and follow any resulting recommendations; (6) submit to random drug screens; and (7) attend and appropriately participate in all scheduled visits with S.S. as directed.

For the next several months, Father's participation in court-ordered services was inconsistent and ultimately unsuccessful. During the CHINS case, Father was arrested and incarcerated for criminal conversion. He also failed to maintain steady housing and employment, missed and/or acted inappropriately on several occasions during visits with S.S., and tested positive for illegal drugs on multiple drug screens through November of 2010. Although Father did complete a drug and alcohol assessment and family functioning/psychological evaluation as ordered by the court, he refused to participate in and/or successfully complete the resulting treatment recommendations, including a substance-abuse treatment program, individual counseling, and parenting classes.

In February 2011, ACDCS filed an amended petition seeking the involuntary termination of Father's parental rights to S.S. On June 22, 2011, Father signed the summons and Notice of Hearing. During an initial hearing on the termination petition held in July

recitation of the facts to those pertinent solely to Father's appeal of the trial court's judgment terminating Father's parental rights to S.S.

2011, Father, who was represented by counsel, appeared in person and denied the allegations of the termination petition. At the conclusion of the initial hearing, the trial court set the evidentiary hearing for August 2, 2011.

Despite his actual knowledge of the time, date, and location of the August 2, 2011, termination hearing, Father failed to show and his attorney made an oral motion to continue the hearing. The trial court found Father had defaulted, but nevertheless granted counsel's motion to continue the proceedings. The termination hearing was then ordered continued until September 6, 2011. ACDCS sent notice of the new termination hearing date to Father's last known address. The notice was later returned as undeliverable. Father's attorney also attempted to notify Father of the new hearing date but was likewise unsuccessful in locating Father.

On the morning of September 6, 2011, Father again failed to appear for court. The termination hearing was continued for an additional two days on the court's own motion, however, due to "exigent circumstances." *Transcript* at 14. At that time, Father's attorney agreed to try to notify Father of the new September 8, 2011 hearing date. Additionally, MCDCS mailed notice of the rescheduled hearing date to Father's last known address.

Father failed to show for the September 8, 2011 termination hearing. At the commencement of the hearing, Father's attorney advised the trial court that he had been unable to contact Father via mail or telephone. Counsel therefore stated that he believed Father never received actual notice of the September 8, 2011 termination hearing date. In proceeding with the termination hearing in Father's absence, the trial court determined that Father had been provided with sufficient notice and opportunity to appear, but had chosen

4

not to do so. Specifically, the trial court found that the record clearly showed Father was properly served with the summons and termination petition in the underlying case. The court went on to find that Father had actual knowledge of the originally scheduled August 2011 termination hearing and had been called, but he defaulted.

During the termination hearing, DCS presented significant evidence establishing that Father had failed to complete a majority of the court-ordered reunification services, including a substance-abuse treatment program, random drug screens, individual counseling, regular participation in AA/NA meetings, and parenting classes. The evidence presented by DCS also established that Father had lost his visitation privileges with S.S. on several occasions during the underlying CHINS case, that the police had to be called on at least two occasions during visits due to Father's aggressive conduct in front of the child, and that Father had not visited with S.S. since July 2011. In addition, the evidence presented established that approximately two months before the termination hearing, Father ceased all communications with his DCS case worker, service providers, and attorney, and that Father's whereabouts at the time of the termination hearing remained unknown. Finally, DCS presented evidence showing S.S. was happy and thriving in a pre-adoptive relative foster care home.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On November 29, 2012, the trial court entered its judgment terminating Father's parental rights to S.S. Father now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable

5

inferences that are most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the trial court's decision, we must affirm. *Id.*

Here, the trial court made detailed findings in its order terminating Father's parental rights to S.S. Where the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

1.

Father first claims that he is entitled to reversal because DCS failed to provide him with proper notice of the September 8, 2011 termination hearing. Presumably due to the significance of the interests at stake, our legislature has enacted an additional notice requirement in involuntary termination proceedings. Specifically, Ind. Code Ann. § 31-35-2-6.5 (West, Westlaw through legislation effective May 31, 2012) provides, in relevant part, that "at least ten (10) days before a hearing on a petition or motion under this chapter . . . the

person or entity who filed the petition to terminate the parent-child relationship [here, DCS] . . . . shall send notice of the review to . . . [t]he child's parent . . . ."

"Compliance with the statutory procedure of the juvenile code is mandatory to effect termination of parental rights." *In re T.W.*, 831 N.E.2d 1242, 1246 (Ind. Ct. App. 2005). Although statutory notice "is a procedural precedent that must be performed prior to commencing an action," it is not "an element of plantiff's claim." *Id.* Failure to comply with statutory notice is thus "a defense that must be asserted." *Id.* Once placed in issue, "the plaintiff [here, DCS] bears the burden of proving compliance with the statute." *Id.*

Because Father claimed that DCS failed to provide him with proper notice of the September 8 termination hearing, the burden has shifted to DCS to prove compliance with I.C. § 31-35-2-6.5. Here, it is undisputed that DCS provided Father with proper notice that a termination proceeding regarding S.S. was pending. In fact, on June 22, 2011, Father received and signed the Summons and Notice of Hearing, which explicitly stated, "[I]f you fail to appear at the hearing, the Juvenile Court may terminate your parent-child relationship; and if the court terminates your parent-child relationship[,] you will lose all parental rights, powers, privileges, immunities, duties, and obligations including any rights to custody, control, visitation, or child support . . . ." *State's Exhibit* 1 at 1. Father thereafter appeared in person and was represented by counsel at the initial hearing on the termination petition held in July 2011. At the conclusion of the initial hearing, the trial court set the evidentiary hearing for August 2, 2011. Father was therefore provided with actual notice of the August 2011 termination hearing at that time. Unfortunately, Father failed to appear.

DCS and counsel for Father thereafter attempted to notify Father of the continued

evidentiary hearing set for September 6, 2011, by sending letters to Father's last known address and by telephoning Father. When Father failed to show for the September 6, 2011 hearing, DCS and counsel for Father again attempted to contact Father and to notify him of the continued evidentiary hearing scheduled for September 8 both by telephone phone and by mail, but Father's refusal to provide DCS and his own attorney with updated contact information thwarted all such efforts.

In terminating Father's parental rights, the trial court found that "[F]ather . . . who failed to appear, has been served with notice of the proceedings in the most effective means under the circumstances, and a good faith effort has been made to locate said party. Nevertheless, [Father] has failed to appear, despite said proof of service. The evidence submitted by DCS supports this finding. A review of the record makes clear that, through his own actions, Father eluded DCS and his attorney for a majority of the termination case proceedings. Moreover, at the time of the termination hearing, Father's whereabouts were completely unknown, notwithstanding the trial court's dispositional order specifically requiring Father to maintain contact with DCS and to provide the case manager with any changes in address or phone number. By failing to maintain contact with DCS, Father also knowingly failed to visit with S.S. and/or inquire about his child's well-being for months leading up to the termination hearing.

Although we agree with Father's general statement that I.C. § 31-35-2-6.5 requires DCS to send notice of the termination hearing to Father's last known address at least ten days before the hearing, we have previously explained that this statute does not require compliance with Indiana Trial Rule 4, which governs service of process and incorporates a

8

jurisdictional component. *See In re C.C.*, 788 N.E.2d 847 (Ind. Ct. App. 2003) (concluding that I.C. § 31-35-2-6.5 does not require compliance with T.R. 4). Moreover, based on the foregoing, we conclude that any failure to notify Father of the rescheduled September 8 termination hearing was the direct result of Father's purposeful decision to ignore the trial court's dispositional orders and to refuse to maintain contact with DCS. Although we acknowledge that by continuing the September 6 termination hearing to September 8, thereby making it impossible for DCS to provide Father with the requisite ten-day notice described in I.C. § 31-35-2-6.5, under the specific circumstances of this case, we cannot conclude that DCS's attempts at compliance with the statute were inadequate.

Father had actual notice of the originally scheduled August 2011 termination hearing. He was defaulted by the trial court at the commencement of the hearing, however, when he was called by the court and failed to appear. Both DCS and Father's attorney thereafter mailed notices of the two subsequently rescheduled evidentiary hearings to Father's last known address. They also attempted to contact Father via telephone. Under these circumstances, we cannot conclude that DCS's attempts at compliance with the statute were inadequate. *See, e.g., Q.B. v. Marion Cnty. Dep't Child Servs.*, 873 N.E.2d 1063, 1067 (Ind. Ct. App. 2007) (concluding that DCS's attempts at compliance with I.C. § 31-35-2-6.5 were adequate where parent disregarded court order to inform case manager of changes in address and phone number and eluded DCS and own attorney); *In re C.C.*, 788 N.E.2d 847 (Ind. Ct. App. 2003) (concluding that notice sent to Father's last known address at homeless shelter was not defective under I.C. § 31-35-2-6.5 even though case manager knew father no longer lived there because it was father's last known address and statue does not require compliance

9

with T.R. 4).

2.

We now turn to Father's allegation that there is insufficient evidence to support the trial court's judgment. The traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B)　　that one (1) of the following is true:
>
> > (i)　　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)　　There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > * * *
>
> (C)　　that termination is in the best interests of the child . . . .

Ind. Code Ann. § 31-35-2-4(b)(2) (West, Westlaw through legislation effective May 31, 2012).[2] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw through legislation effective May 31, 2012)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw through end of 2011 1st Regular Sess.). Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) of the termination statute cited above.[3] *See* I.C. § 31-35-2-4(b)(2).

At the outset, we note that DCS needed to establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

[3] Father does not challenge the sufficiency of the evidence supporting the trial court's findings regarding the remaining elements of Indiana's termination statute, including whether the child was removed from her care for the requisite amount of time, whether termination of parental rights is in S.S.'s best interests, and whether there is a satisfactory plan for the future care and treatment of the child. *See* I.C. §§ 31-35-2-4(b)(2)(A), (C), and (D). Father has therefore waived appellate review of these issues. *See Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied*.

parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the trial court found DCS presented sufficient evidence to satisfy the first two subsections of (b)(2)(B) of the termination statute. *See* I.C. § 31-35-2-4(b)(2)(B)(i) & (ii). Because we find it dispositive under the facts of this particular case, we shall consider only whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in S.S.'s removal or continued placement outside Father's care will not be remedied.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Here, in finding there is a reasonable probability that the conditions resulting in S.S.'s removal and/or continued placement outside of Father's care will not be remedied, the trial court made numerous detailed findings regarding Father's unresolved substance-abuse issues and lack of progress in improving his ability to care for S.S. Specifically, the trial court found that although Father had eventually completed the court-ordered drug and alcohol assessment, he nevertheless "failed to comply with the recommendations of the assessment and did not complete the substance-abuse counseling and did not regularly participate in AA/NA meeting or submit to random urinalysis testing." *Appellant's Appendix* at 70. The trial court also observed in its findings that although Father had completed the family functioning assessment and psychological evaluation, he "failed to complete the individual counseling . . . and parenting classes", which would have "assisted [Father] in caring for the child and in providing for the basic necessities of a suitable home for the raising of the child." *Id.*

Regarding visitation, the trial court noted that visitations were "sometimes chaotic," that Father's behavior toward visit supervisors was "often inappropriate" and "sometimes hostile," and that the "police had to be contacted on at least two occasions." *Id.* at 71. The court went on to find that the "inappropriate behavior exhibited by [Father] during supervised visits confirms the need for his participation in the individual counseling recommended by his Family Functioning Assessment and the need for parenting classes to assist him in learning the importance of behaving appropriately in the presence of [S.S.]." *Id.* The trial court further found:

13

[F]ather absented himself from the CHINS proceedings by failing to maintain contact with the family case manager and failing to notify her of a change in addresses. His last visit with the child occurred in July of 2011.

During the CHINS proceedings . . . [Father] lived with friends, at a few different residences since the proceedings began, but never had independent housing or employment with which to support himself and his child.

At the time of the initiation of the CHINS proceedings in the underlying CHINS cause, [Father] was not providing for the basic necessities of a suitable home for the raising if the child. At the time of the initiation of the termination proceedings, [Father's] whereabouts were unknown and he had not visited the child in approximately two months. Further, he continued to fail to provide for the basic necessities of a suitable home for the raising of the child and did not participate in services designed to assist him with providing care for the child.

Accordingly, the Court finds that [DCS] has proven by clear and convincing evidence that the allegations of the petition are true in that there is a reasonable probability that the conditions that resulted in [S.S.'s] removal and the reasons for the placement outside the parents' home will not be remedied . . . .

*Id.* Our review of the record leaves us convinced us that these findings and conclusions are supported by abundant evidence.

During the termination hearing, DCS case manager Heather Calera recommended termination of Father's parental rights. In so doing, Calera confirmed that Father admitted to having using cocaine in his past, that he only "maintained sporadic contact" with DCS throughout the CHINS case, and that he failed to successfully complete a majority of the court-ordered reunification services. *Transcript* at 91.

As for Father's participation in visits with S.S., several visitation supervisors confirmed that Father's visits with S.S. were marked by "ups and downs," that Father would sometimes appear to be "angry" and his tone of voice was sometimes "not friendly" during visits. *Id.* at 29, 32. Family restoration supervisor Deb Meusing likewise confirmed that

14

Father had become "irate" a "few times" during visits with S.S. and that the police were called at least "twice" when Father because "upset" with the visit supervisors. *Id.* at 44-45

This court has repeatedly recognized where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, Father has demonstrated a persistent unwillingness or inability to take the actions necessary to show he is capable of providing S.S. with the safe, stable, and drug-free home environment the child needs. Moreover, Father's arguments on appeal, including his assertions that there was "no finding that he was using drugs at the time of the termination hearing," and that there was conflicting evidence as to whether his visit with S.S. were "sometimes chaotic", *Appellant's Brief* at 14, 16, amount to an impermissible invitation to reweigh the evidence, which is beyond our purview. *See, e.g., D.D.*, 804 N.E.2d 258.

3.

Finally, we consider Father's contention that the trial court abused its discretion in admitting certain testimonial evidence over Father's objection. The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. We will find an abuse of discretion only where the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* If a trial court abuses its discretion by admitting the challenged evidence, we will reverse for that error only if the error is inconsistent with substantial justice or if a substantial right of the party is affected. *In re S.W.*, 920 N.E.2d 783 (Ind. Ct. App. 2010). Moreover, any error caused by the admission of evidence is harmless error, for which we will not reverse, if the

15

erroneously admitted evidence was cumulative of other evidence properly admitted. *Id.*

Although Father objected to the admission of certain testimony from DCS case manager Calera concerning Father's statements regarding his past drug use and Father's failure to complete several court-ordered services including substance-abuse treatment, Father failed to object to the admission of this same evidence through the testimony from several different witnesses. For example, court-appointed special advocate Julia McIntosh confirmed during the termination hearing that Father's "lack of follow through" and failure to complete court-ordered services, including "counseling" and "anger mangement" prevented her from recommending reunification. *Transcript* at 104-105. In addition, Father admitted in his brief on appeal that he had used illegal substances in the past. Thus, even assuming without deciding that the challenged testimony concerning Father's past drug use and failure to complete court-ordered services, including substance-abuse treatment, was improperly admitted into evidence, such evidence was merely cumulative of other, properly admitted testimony by several witnesses.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

MAY, J., and BARNES, J., concur.